#27966-a-SLZ
**2017 S.D. 52**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

SURAT FARMS, LLC,                                              Plaintiff and Appellant,

   v.

BRULE COUNTY BOARD
OF COMMISSIONERS,                                        Defendant and Appellee,

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
BRULE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE BRUCE V. ANDERSON
Judge

\* \* \* \*

THOMAS W. CLAYTON
Sioux Falls, South Dakota                        Attorney for plaintiff and
                                                                 appellant.


DAVID J. LARSON
JESSICA HEGGE of
Larson Law, PC
Chamberlain, South Dakota                     Attorneys for defendant and
                                                                 appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON APRIL 24, 2017
OPINION FILED **08/30/17**

#27966

ZINTER, Justice

[¶1.] Albert Delany filed a drainage complaint with Brule County alleging that Surat Farms LLC (Surat) was partially blocking drainage of an intermittent watercourse. Delany contended that the blockage caused water to back up onto his adjacent property. The Brule County Board of Commissioners (Board) held a hearing and found that Surat impermissibly altered the watercourse. Surat appealed the Board's decision, and the circuit court, after de novo review, affirmed. Surat appeals. We affirm.

**Facts and Procedural History**

[¶2.] Delany and Surat own adjacent farmland located near the Bijou Hills in Brule County. A natural watercourse flows through both properties. It enters Delany's property from the south and continues northeast until it enters a culvert that runs underneath 352nd Avenue, which divides Delany's and Surat's land. As the water exits the culvert, it empties onto Surat's property, where it naturally continues northeast along the watercourse for some distance.

[¶3.] In 2013, Surat hired a contractor to install drain tile under a field on its side of 352nd Avenue. The contractor installed a subsurface inlet immediately beyond the culvert's outlet. The subsurface inlet was covered by crushed rock and dirt. Surat's contractor testified that the inlet enabled water to slowly percolate into the drain system, but the inlet did not directly accept surface water.

[¶4.] Delany claimed that in 2014, underground water began entering his basement on his property. Unsure of the source of the problem, he filed a drainage complaint against both Surat and Gary Dozark, an upstream landowner. A county

-1-

drainage official inspected the properties. She observed cattails, reeds, dead brush, and trees on Delany's property that she believed might be impeding water flow into the culvert. Delany cleared the blockages but continued to experience water backup.

[¶5.] Consequently, Delany filed a second complaint. He also hired Brosz Engineering to prepare a site map and determine elevations on the properties. Brosz found a gradual downslope as the water passed through both properties. The water entered Delany's property at an elevation of 1,761.4 feet; it left Delany's property and entered into the culvert inlet at 1,760.34 feet; it left the culvert's outlet at 1,760.02 feet; and it was deposited onto Surat's property at an elevation of 1,760 feet. Although these elevations confirmed a downslope in the natural drainage, Brosz found an approximate 15-inch rise in elevation (1761.25 feet) just beyond the culvert's outlet where the crushed rock and dirt was placed for Surat's drain system. That was the place where it is alleged that Surat's tiling project caused water to back up onto Delany's land.

[¶6.] The Board inspected the properties and held a hearing. Counsel appeared on behalf of both parties and presented evidence.[1] In its findings of fact and conclusions of law, the Board found that Surat's project "altered the natural flow of the water" running from Delany's land to Surat's land. The Board "required

---

1. Although Surat's drain tile system was a focus at the hearing, Surat refused to provide the Board with information regarding the construction and size of the drain system it had installed on its property. It also appears that it had not obtained a permit to install the drain tile.

[Surat] to take appropriate action to restore the natural flow of water . . . or otherwise assure [sic] the drainage of the Delany property accordingly."

[¶7.]     Surat appealed the Board's decision to the circuit court. The court conducted a de novo review of the Board's decision. The court visited the site, made observations, and considered both witness and documentary evidence. The court found that the soil elevation near the drain tile inlet was acting as a dam, backing up water onto Delany's land. The court also found that the minimal differences in elevation along the watercourse meant that even a minor backup of water could significantly impact an upstream landowner. Finally, the court found Delany credible when he testified that the backed-up water had rendered portions of his land unsuitable for calving and haying. Therefore, the court "affirmed [the Board's decision] in all respects."

[¶8.]     Surat appeals,[2] raising two issues. It first contends that the circuit court erred in finding that Surat's tiling project impermissibly altered the

---

2.     This action began with a complaint filed by Delany against Surat. Following the Board's ruling in favor of Delany, Surat appealed to the circuit court, naming the Board as the appellee. The Board responded, moving to dismiss the appeal because the Board had only acted in a quasi-judicial capacity and Surat failed to join Delany who was the real party in interest. The record suggests that the motion concerning the proper parties on appeal was abandoned. The motion was not pursued, Delany appeared at trial, and the Board's counsel defended the Board's decision. Following the circuit court's decision in favor of Delany, Surat then appealed to this Court. Again, Delany was not named as the real party in interest. Similarly, the Board, through its counsel, defended the circuit court's decision in favor of Delany.

Appeals involving county commissioner decisions should be taken in the names of the parties whose interests are at stake. *Lyman Cty. v. Bd. of Comm'rs of Lyman Cty.*, 14 S.D. 341, 345, 85 N.W. 597, 598 (1901). That is because in some county commission appeals "the commissioners have no

(continued . . .)

watercourse. Alternatively, Surat contends that if the watercourse was impermissibly altered in some respect, the court erred in finding that Delany suffered the causally-related damages he claimed.

## Standard of Review

[¶9.]        Surat appealed to the circuit court under SDCL 7-8-27, which provides that "[f]rom all decisions of the board of county commissioners . . . there may be an appeal to the circuit court by any person aggrieved[.]" SDCL 7-8-30 provides that "[a]ll appeals thus taken to the circuit court shall be . . . heard and determined de novo." This Court's cases have not consistently stated the deference required by reviewing courts under "de novo" reviews of board of county commissioner decisions. On one hand we have said that a "court should determine anew the question . . . independent of the county commissioner's decision." *Goos RV Ctr. v. Minnehaha Cty. Comm'n*, 2009 S.D. 24, ¶ 8, 764 N.W.2d 704, 707. In such cases, the court "[i]n effect . . . sits as another board[.]" *Chicago & N.W. Ry. Co. v. Schmidt*, 85 S.D. 223, 227, 180 N.W.2d 233, 235 (1970). On the other hand, we have stated that the circuit court should not sit in replacement as a one-person board. *See In re Conditional Use Permit Denied to Meier*, 2000 S.D. 80, ¶ 22, 613 N.W.2d. 523, 530.

---

(. . . continued)

> more interest in its result than has the judge of the circuit court in the result of appeals from decisions in [the judge's] court." *Id.* Further, the failure to properly appeal can result in an unlawful adjudication of another person's interest without notice or opportunity to be heard. *See id.* At all times in these proceedings, the litigation has remained a real dispute between two landowners concerning their respective drainage rights. Further, unlike *Lyman County,* there is no indication that the unnamed real party in interest (Delany) lacked notice and opportunity to be heard. Therefore, we entertain the appeal.

Rather, the circuit court may only review the propriety of the action, which is a much more deferential standard involving the question whether the Board's decision was arbitrary and capricious. *See Goos RV Ctr.*, 2009 S.D. 24, ¶¶ 9-14, 764 N.W.2d 704, 707-09.

[¶10.]     We have recently resolved the issue regarding the level of deference required to be given to non-judicial entities when the Legislature has prescribed de novo review of their decisions. *See S.D. Dep't of GF&P v. Troy Twp.*, 2017 S.D. 50 ___ N.W.2d ____. Applying *Troy Township* in this case, we first must determine whether the Board's resolution of the drainage complaint was a "quasi-judicial" matter. If so, then de novo review is appropriate. *Id.* ¶ 24, ___ N.W.2d at ____. If not, then review is limited to "the question . . . whether the [Board] 'acted unreasonably, arbitrarily, or . . . manifestly abused [its] discretion.'" *Id.* (quoting *Dunker v. Brown Cty. Bd. of Ed.*, 80 S.D. 193, 203, 121 N.W.2d 10, 17).

[¶11.]     Here, the Board's task—an adjudication of a land-drainage dispute between two landowners—was quasi-judicial. It involved a land dispute between neighbors, a dispute that could have been "determined as an original action in the circuit court." *Id.* ¶ 21, ___ N.W.2d at ___; *accord Knodel v. Kassel Twp.*, 1998 S.D. 73, ¶ 10, 581 N.W.2d 504, 508 (holding that in cases where an upstream landowner casts excess water over a downstream landowner's property, "[a]ctionable injury may occur if increases in volume or rate cause flooding or erosion."). Because the Board's resolution of this drainage dispute was a quasi-judicial matter, the circuit court correctly reviewed the Board's decision anew.

[¶12.] A different standard applies to our review of the circuit court's decision. We apply the clearly erroneous standard to factual findings by the circuit court. *Tisdel v. Beadle Cty. Bd. of Comm'rs*, 2001 S.D. 149, ¶ 5, 638 N.W.2d 250, 252. "Under [that] standard, we do not analyze 'whether this Court would have made the same finding that the trial court did,' but rather we look at 'whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed.'" *Id.* ¶ 5, 638 N.W.2d at 252-53 (quoting *In re Estate of Roehr*, 2001 S.D. 85, ¶ 4, 631 N.W.2d 600, 601). Conclusions of law are given no deference and are reviewed de novo. *City of Aberdeen v. Rich*, 2003 S.D. 27, ¶ 9, 658 N.W.2d 775, 778.

**Decision**

[¶13.] Surat first argues it did not impermissibly alter the natural flow of the watercourse. Surat relies on the "reasonable use" rule in surface-water drainage law. It claims that under that rule it was "legally privileged to make reasonable use of its land, even though the flow of the surface waters is altered and causes some harm to [Delany]." *See First Lady, LLC v. JMF Props., LLC*, 2004 S.D. 69, ¶ 11, 681 N.W.2d 94, 99. Surat contends that under a balancing of the applicable "reasonable use" factors enumerated in *First Lady*, it was entitled to construct and operate its drainage system even though the flow of surface waters were altered and caused harm to Delany. *See id.*

[¶14.] The Board, however, contends that the "civil law rule" applies. Under that rule, the downstream property is burdened "with an easement under which the dominant, or upper property owner may reasonably discharge surface water over

the servient estate through natural watercourses." *Knodel*, 1998 S.D. 73, ¶ 10, 581 N.W.2d at 507. Therefore, under that rule, "[a] lower property owner cannot interfere with the natural flow of surface water to the detriment of an upper property owner." *Id.* ¶ 10, 581 N.W.2d at 508.

[¶15.]     The rule that governs depends on whether the drainage occurs on rural or urban property. "For rural surface water drainage, South Dakota follows the civil law rule," *Hendrickson v. Wagners, Inc.*, 1999 S.D. 74, ¶ 10, 598 N.W.2d 507, 510, and "for urban drainage of surface water, this Court has adopted the 'reasonable use' rule." *Strong v. Atlas Hydraulics, Inc.*, 2014 S.D. 69, ¶ 22, 855 N.W.2d 133, 142. The civil rule controls here because this case involves rural property over which natural surface water backed up due to alterations on the surface. Because the civil rule applies, Surat's claim of privilege to construct a drain system that dams surface water and floods an upstream property is without merit.

[¶16.]     Surat alternatively argues that, factually, any increased elevation on its land preexisted installation of the drain system. Surat contends that except for Delany's testimony, "the record contains not one iota of evidence that Surat's tiling caused the 15 inch jump" obstructing the watercourse. Surat also contends its evidence demonstrated a preexisting elevation. Surat specifically contends that: (1) according to its drain tile contractor, installation of the drain tile caused minimal alteration of the soil—the contractor smoothed the land "to its original condition" after placing the drain tile; (2) a contour map, prepared by the tile contractor prior to installation of the drain tile, can be interpreted to suggest that the increased

elevation preexisted the contractor's work; and (3) aerial photographs taken prior to installation of the drain tile show some water pooling on both sides of the culvert. Surat argues this evidence establishes that the drain system did not alter the natural flow of the watercourse.

[¶17.]    But Surat's evidence was far from compelling. The aerial photographs indicated that the watercourse flowed from the culvert in years prior to 2013, but the image from 2015 shows the damming complained of by Delany. Although the contour map prepared by Surat's tile contractor could be interpreted to suggest that some variations in elevation preexisted Surat's tile work, the map was prepared by an interested witness. Moreover, the map's utility was questionable in light of contrary evidence, including Delany's testimony and the circuit court's own observations of the land. Most importantly, the contractor himself qualified much of his claim of "no increased elevation" as mere presumptions. He conceded that the backup of water could be occurring in the area in question; and he only opined that if there were any changes to the topography, it was not caused by his work given his efforts to level the land "back out to where it was before we got there." Finally, considering the relatively flat slope of the land in that area, any unnatural increase in elevation caused by the drain inlet construction would cause the backup of water.

[¶18.]    Surat's evidence creates a dispute of fact regarding the 15-inch increase in elevation. But "[t]he trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony," and "all conflicts in the evidence must be resolved in favor of the trial court's findings." *Century 21 Assoc. Realty v. Hoffman*, 503 N.W.2d 861, 864 (S.D. 1993). Here, the circuit court was

best positioned to evaluate the conflicting evidence, and our review of the record evidence does not leave us with a "definite and firm conviction that a mistake has been committed." *Tisdel*, 2001 S.D. 149, ¶ 5, 638 N.W.2d at 253. The circuit court did not clearly err in finding that Surat impermissibly altered the watercourse.

[¶19.] Surat finally argues that even if installation of the drain system altered the watercourse's natural flow, Delany did not suffer the damages he claimed to his basement and land. More specifically, Surat claims that if its drain system backed up water, the blockage did not cause the water to appear in Delany's basement or make his land unsuitable for calving or haying. Surat further claims that even if there was some backup of water, under *First Lady* and *Feistner v. Swenson*, 368 N.W.2d 621 (S.D. 1985), Delany must have shown more than just "some harm": he must have shown "serious damage."

[¶20.] We first address Surat's factual contention that there was no water in Delany's basement or flooding of his land. Surat makes a "physics" argument, claiming that it would be physically impossible for any blockage at the inlet's elevation to produce a big enough pool to enter Delany's basement at its elevation. Surat points out that its subsurface drain inlet was at an elevation of 1,760 feet, and the ground floor of Delany's home was at an elevation of 1,774 feet. Assuming Delany's basement was 8 feet beneath this latter elevation, Surat argues that a pool of water from the subsurface drain inlet would have to rise 8 feet and "defy the laws of physics" to reach Delany's basement. But Surat did not introduce hydrological evidence of the subsurface showing how water moves underground in that

particular area. Without such evidence, there is no conclusion to be drawn solely from the relative elevations of the subsurface drain inlet and Delany's basement.

[¶21.]        Surat's authorities also fail to support his legal argument that it had the right to back up water. Neither *First Lady* nor *Feistner* considered the extent of harm an upstream owner must tolerate from the backup of water caused by a downstream owner. Both cases concerned the amount of drainage the downstream estate must accept before the upstream estate's change in discharge is prohibited. Additionally, *Feistner* did not hold that natural drainage rights include the right to flood a neighboring property. On the contrary, we specifically stated that even a dominant owner's right to discharge does not include the right "to affect [a] neighbor's land in some way other than the way in which it had been affected before." *Feistner*, 368 N.W.2d at 623.

[¶22.]        With respect to how the water impacted Delany's cropland, Surat argues that the only evidence of calving or haying on Delany's property came from outdated photos taken in the 1980s and that much of Delany's cropland was in the conservation reserve program (CRP) for the last ten years. However, Delany provided contrary evidence. He testified that the rangeland around the drainage area was not in CRP. He also testified that he was able to hay the land around the drainage area prior to Surat's installation of drain tile. Thus, there was conflicting evidence on this point, and the court's findings were not clearly erroneous.

[¶23.]        Ultimately, Surat misconstrues the relief that was awarded below. Although Surat argues that Delany was not entitled to damages for basement flooding and hay loss, Delany was not awarded such damages. The Board and the

circuit court only ordered enforcement of the drainage easement Delany held on Surat's land. *See Knodel*, 1998 S.D. 73, ¶ 10, 581 N.W.2d at 508 (holding that upstream landowners possess an easement over downstream estates to discharge surface water over the servient estate through natural watercourses). And the Board—and in turn, the circuit court— only required Surat to "take appropriate action to restore the natural flow of water across [its land] or otherwise assure [sic] the drainage of the Delany property accordingly." This was appropriate injunctive relief. *See Riha v. FirsTier Bank*, 539 N.W.2d 632, 792 (Neb. 1995) ("The flow of water cannot be interfered with by a lower proprietor to the detriment of the upper proprietor. The proper remedy in water drainage disputes is an injunction.").

[¶24.] The evidence supports the circuit court's finding that Surat's drain system improperly interfered with Delany's drainage rights, and the court did not err in awarding injunctive relief. We affirm.

[¶25.] GILBERTSON, Chief Justice, and SEVERSON and KERN, Justices, and WILBUR, Retired Justice, concur.